**DAVID J. HOLDSWORTH (4052)**
Attorney for Plaintiff
9125 South Monroe Plaza Way, Suite C
Sandy, UT 84070
Telephone (801) 352-7701
Facsimile (801) 567-9960
david_holdsworth@hotmail.com

---

IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | | |
|---|---|---|
| FRANCINE WEISS a.k.a. MICKIE F. WEISS, | : | **VERIFIED COMPLAINT** |
| | : | **(JURY TRIAL DEMANDED)** |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SALT LAKE COMMUNITY COLLEGE, | : | Civil No.: |
| | : | |
| Defendant. | : | Hon. |

COMES NOW the Plaintiff, Francine Weiss a.k.a. Mickie F. Weiss ("Ms. Weiss" or "Plaintiff"), complains of Defendant Salt Lake Community College ("SLCC"), demands trial by jury and as and for causes of action alleges as follows:

**JURISDICTION**

1.      This action is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, and pursuant to the Americans with Disabilities Act ("ADA") and/or the Vocational Rehabilitation Act ("VRA"), for discrimination in employment

and for retaliation. Jurisdiction is specifically conferred on this Court by 42 U.S.C. §

2000 e (5). Equitable and other relief are also sought under 42 U.S.C. § 2000 e (5) (g).

Jurisdiction is also based on 28 U.S.C. §§ 1331, 1332 and 42 U.S.C. § 1981, et. seq.

## PARTIES

2.     Francine Weiss a.k.a. Mickie F. Weiss ("Ms. Weiss" or

"Plaintiff") is a citizen of the United States and, at all times relevant hereto, was a

resident of the State of Utah.

3.     Salt Lake Community College ("SLCC") is an "employer" within

the meaning of Title VII and the ADA which does business in Salt Lake County in the

State of Utah.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

4.      On January 24, 2019, Ms. Weiss filed an Intake Questionnaire

with the UALD. This indicated her desire to activate the UALD/EEOC charge filing

machinery.

5.     On March 5, 2019, Ms. Weiss formally signed her Charge of

Discrimination.

6.     On March 26, 2019, the UALD received Ms. Weiss' Charge of

Discrimination.

7.

8.      Plaintiff filed her Charge of Discrimination within 180 days from the last date of the alleged harm.  Plaintiff alleges the Court may exercise jurisdiction over all non-discrete discriminatory actions constituting a continuing violation beginning on or before _____, the date which is 180 days before Petitioner filed her Charge of Discrimination, and continuing past _____, and over all discrete discriminatory actions occurring on or after _____.  The Court may treat all alleged discrete discriminatory actions occurring before this date as being untimely for purposes of relief, but may give weight to evidence of such for evidentiary purposes. Plaintiff alleges all jurisdictional requirements have been met as required by Title VII of the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, as amended, the Americans with Disabilities Act of 1990, as amended, and the Utah Antidiscrimination Act of 1965, as amended.

9.      That UALD subsequently waived the Charge of Discrimination to the EEOC.

10.      On or about September 1, 2022, the EEOC issued her a Notice of Right to Sue letter.

## STATEMENT OF FACTS

11.      Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

3

12.     Plaintiff alleges that, on January 1, 2014, Defendant hired her as a Nursing faculty member.

13.     Plaintiff is a female was strongly held religious beliefs.

14.     Plaintiff is a person who has a disability in the form of the impairment of frequent and severe migraine headaches, which substantially limits several of her major life activities, including seeing (vision), thinking, concentrating, sleeping, and working.

15.     At all times relevant hereto, Plaintiff worked as Interim Associate Dean of Nursing, then, Associate Dean of Nursing.  She reported to JoAnne Wright, Dean of the School of Health Sciences.

16.     She alleges she had over 30 years of experience in health care and 17 years of experience in academia, including experience at another institution as a Dean of Nursing.  Plaintiff alleges she wanted to spend the last half of her career teaching and was excited to be offered a job as a faculty member at SLCC.

17.     Within only a few months of starting the position, Plaintiff was approached by Provost Picard ("Provost Picard").  He informed Plaintiff that the nursing department/program was in trouble and that the Department had been given a Notice of Concern by the accrediting body.  He informed her that the pass rates were low and there was a risk of the program being shut down.  He asked Plaintiff if she

4

could help by serving as the Interim Dean.  Plaintiff told him that she wanted to teach, but agreed to help, as long as she could return to faculty once she had helped the program become successful.  Provost Picard gave Plaintiff his word that her service as the Interim Dean would only be temporary.  And, in April 2014, Plaintiff began to serve as the Interim Associate Dean of Nursing.

18.    Plaintiff alleges that she worked hard to bring the department up to a successful status and, in 2016, she requested to move back to a faculty position. Plaintiff's supervisor, JoAnne Wright ("Wright"), and the new Provost, Clifton Saunders ("Provost Saunders"), took Plaintiff to lunch and told her that they needed her to continue in the Dean position because the nursing program was coming up for an accreditation visit.  They told Plaintiff that they were concerned that it would look bad for the Dean of Nursing position to show that it had filled by an Interim Dean for so long and so they asked Plaintiff to apply for the official position.  Plaintiff expressed her desire was to teach and did not want to work as a Dean long term.  They assured Plaintiff that, after the accreditation visit, she could return to a faculty position.

19.    Later that week, Wright met with Plaintiff in her office and told Plaintiff that she had turned of the department around and that Wright could not succeed with the accreditation process without her.  Wright promised Plaintiff that, after the accreditation was complete, she could return to the faculty position.  Plaintiff

5

did not want to let Wright down and she cared about the school, so she agreed and,

thereafter, Plaintiff was promoted to the position of Associate Dean of Nursing, with

the understanding that, after the accreditation was complete, she return to a faculty

position.

20.     Plaintiff alleges that, around March 2018, she had a one-on-one

meeting with her supervisor.  During such one-on-one meeting, Wright questioned

Plaintiff about her religion and told her that Wright could not believe that she had

grown up in Orem and that she was not "Mormon".  Plaintiff alleges that Wright told

her that it is "the one true religion and that Heavenly Father sends people into our lives

to learn the truth".  Plaintiff alleges that Wright would quote verses from a Mormon

book of scripture, the Book of Mormon, each time that they had one-on-one meetings

and would sometimes send them to Plaintiff in texts.  Plaintiff alleges that Wright gave

her a Gold chariot and told her that it represented a Bible story.  Plaintiff alleges that

Wright told Plaintiff to put it in her office so that she could look at it while she was

"fighting against evil".  Plaintiff alleges that Wright was referring to some of the

nursing faculty as the "evil ones".  Plaintiff alleges that, at first, she pretended to go

along with it, but then made it clear to Wright that she did not want to talk about

religion.

6

21.     Plaintiff alleges that, around March 2018, she reported to John Robinson ("Robinson"), Human Resources, that she felt that she was being harassed by Wright concerning her religion.  Plaintiff alleges that she also documented her concern in a letter to Robinson.  Plaintiff alleges that Robinson did not do anything about her report and, after she made the report, Wright became very hostile towards her.

22.     Plaintiff alleges that, from November 2017 to March 2018, she worked 70 to 90 hours every week, including Saturday and Sunday.  She alleges she worked through Thanksgiving and Christmas breaks to complete the self-study for an accreditation visit that happens every seven years.

23.     Plaintiff alleges that all but three faculty members were new and not able to contribute to developing the self-study.  The department was missing documentation and Plaintiff's office was broken into three times, resulting in lost documents that had to be redeveloped.  Plaintiff alleges the school ended up putting a secured lock on the door to her office.

24.     Plaintiff alleges that, on April 2, 2018, Wright presented a Notice of Concern to Plaintiff.  Plaintiff alleges that the letter was bizarre because the accreditation had been successful and no deadlines had been missed.  Plaintiff alleges that she had not gone on vacation for five weeks, the tenure process was completed

accurately and on time, and that she had already completed over six months before the

letter the expectations that Wright had listed.

25.     Plaintiff alleges she sent an e-mail to Robinson requesting a

grievance and to Provost Saunders asking for a meeting to discuss the circumstances.

26.     Plaintiff alleges that she tried to submit a grievance related to the

letter to Human Resources, but was denied.  Plaintiff alleges she was told that the letter

was only for Wright's records and that it was not a part of her employee file.

27.     Plaintiff alleges that she then requested a meeting with her second

level supervisor, Provost Saunders, but was denied a meeting.

28.     Plaintiff alleges that, on April 2, 2018, within weeks of her report

to Human Resources, her supervisor, Wright, submitted a Notice of Concern against

her.  Plaintiff alleges that the letter was full of false information.  Plaintiff alleges that

she then contacted Robinson and he told her that a Notice of Concern is not within the

policy of the school for administrative discipline and that it would not be placed in her

file.  Plaintiff alleges that Robinson told her not to worry about it, but she was worried.

Plaintiff alleges that she again tried to make an appointment with her supervisor,

Provost Saunders, but was again denied.

29.     Plaintiff alleges that she wrote a response to the Notice of

Concern and sent it to Provost Saunders and carbon copied Robinson and President

Huftalin.  Plaintiff alleges that, in the letter, she addressed each of the areas and showed proof that it was not accurate.  She alleges that she opened up about the religous harassment and the discrimination she was receiving and the fact that she was denied a meeting with Provost Saunders.

30.     Plaintiff alleges that Provost Saunders sent her back a nasty letter denying meeting with her or the nursing faculty.  Plaintiff alleges she sent a letter of complaint to Provost Saunders detailing what was happening to her and carbon copied the next in line of command, President Huftalin ("Huftalin").

31.     Plaintiff alleges that, on April 13, 2018, she received a copy of an email from the Director of Marketing and Communications of SLCC to Wright detailing the marketing success of the nursing program… "I would be interested in hearing from Francine… Maybe there is something to learn or something we can implement for the rest of the Health Science programs".

32.     Plaintiff alleges that, on May 30, 2018, she received a copy of an email from Wright to the Provost and President, stating "Wonderful News", "All that hard work is paid off and I believe the Nursing Program is heading in the right direction".

33.     Plaintiff alleges that, on June 6, 2018, she was elected to lead and represent the Associate Deans of the College.  Plaintiff alleges she received several emails congratulating her on her election.

34.     Plaintiff alleges that, on June 11, 2018, Provost Saunders removed her from the Search Committee for the Dean of Health Science (her future supervisor), with no explanation.

35.     Plaintiff alleges that, around July 1, 2018, she participated in a meeting with Provost Saunders to discuss a promotion and her new assignment of Dean of Respiratory Services, in addition to the Dean of Nursing position she currently occupied.

36.     Plaintiff alleges that, on July 1, 2018, she received a notice of a raise of a 2.5% increase in salary.  The salary increase was based primarily on merit pay for good work.

37.     Plaintiff alleges that, around the second week of August 2018, Wright resigned as Dean of Health Sciences and Provost Saunders appointed Jennifer Saunders ("Saunders"), former Vice President of Workforce Training Education, as Interim Dean of Health Sciences with his full support.  Saunders stated that she didn't want to do it, but had agreed to Provost Saunders's request and would complete her mission and then return to her other job.  Saunders told the faculty and staff that, if

10

they go above Jennifer Saunders with any concerns, then they will be directed back to her and that she will not take that lightly.

38.     Plaintiff alleges that, on August 8, 2018, during a meeting, Interim Dean Jennifer Saunders asked about a colleague's, Donna Murphy ("Murphy"), case. Saunders demanded that Plaintiff give her the names of everyone from the College that was working on the case. Plaintiff alleges that she was very uncomfortable and didn't answer the questions. Plaintiff alleges that Saunders continued to threaten her with insubordination if she did not answer the questions about Murphy's case. She reported to the College lawyers that Interim Dean Saunders was asking her about the Murphy case. Saunders was present when Plaintiff made the report. Plaintiff felt pressured into signing a document because she was afraid to lose her job.

39.     Plaintiff alleges that she received emails from Saunders about providing negative information about Donna Murphy in connection with the Murphy case. In the emails, Saunders referred to Donna Murphy as "DM" in the email because Human Resources had informed them that, if they used Murphy's full name, then the documentation could be pulled in a GRAMA request.

40.     Plaintiff alleges that, also around the second week of August, she participated in a meeting with Jennifer Saunders behind closed doors with Saunders telling Plaintiff that the college was wasting money on Plaintiff. Plaintiff alleges that

11

Jennifer Saunders told her that, if she wanted to keep her job, then she would cooperate with Provost Clifton Saunders and fire George Schwoegler ("Schwoegler"), who had just returned from FMLA leave.  Plaintiff alleges she reported that she did not agree with the decision to fire Schwoegler, but would follow the policy and procedures of the school to evaluate his performance.  Upon hearing Plaintiff's plan, Saunders became very angry.  Plaintiff alleges that, due to the intensity of that meeting with Saunders, she experienced a migraine that lasted for two days.

41.     Plaintiff alleges that, on August 9, 2018, Saunders demanded that Plaintiff demote a faculty member she supervised, George Schwoegler.  Plaintiff alleges she changed his assignment, which significantly decreased his pay.  Plaintiff alleges this directive made her very sick because he did nothing wrong and had just returned from FMLA leave.  Plaintiff alleges that, due to this action, she was up all night with a migraine headache.

42.     Plaintiff alleges that, on August 15, 2018, she received an invitation from Huftalin's office to join the Senior Leadership team and attend future meetings.

43.     Plaintiff alleges that, on August 15, 2018, she requested the vacation, but was denied such vacation, although she had 270 hours of earned vacation time.

44.     In connection with this denial, Jennifer Saunders told Plaintiff that she was a terrible leader and a disgrace to the College and that she was sent by Provost Saunders to take care of Plaintiff.  Saunders told Plaintiff that she did not deserve to have vacation because of her poor performance.  Plaintiff alleges she asked Saunders to stop making such comments, but she refused and went on for two-and-a-half hours berating Plaintiff.  Finally, plaintiff alleges she told Saunders that, because she was getting a migraine headache, she had to leave.  Plaintiff alleges she left the school with a migraine headache and was not able to work the next day due to said migraine headache.

45.     Plaintiff alleges that, on August 17, 2018, Saunders increased Plaintiff's workload, but at the same time, deprived her of resources that made it impossible for her to complete her work.  Saunders threatened Plaintiff that it would be insubordination if she did not reply to her email by the end of the day.  Plaintiff alleges her computer was not hooked up because of the remodel at the school and she was moving her office that day.  In addition, Plaintiff alleges that Saunders was meeting secretly with Plaintiff's Administrative Assistant and had completely turned the assistant against Plaintiff.  The Administrative Assistance, Angie Bright, the Department's secretary, Patrick Rameriz, would disappear for most of the day.  Plaintiff alleges she would find them together in empty rooms having an affair.

Plaintiff alleges she reported this to Saunders, but Saunders told Plaintiff to not tell anyone.  Plaintiff alleges the affair was common knowledge.  Plaintiff alleges her Administrative assistant stopped talking to her completely.  Plaintiff alleges that after she was terminated, Provost Saunders and Jennifer Saunders had a meeting with the faculty and announce how proud they were of Angie Bright and Patrick Rameriz and put them in charge of the department.  This was three days before school started again and the lab was not completed.  Plaintiff alleges she had to make alternative plans to have the school ready in three days, prepare a faculty meeting in two days, and orient new faculty that had just been hired on.  It is an accreditation requirement for all faculty members to be properly oriented.

46.     Plaintiff alleges that, on August 18 and 19, 2018, a Saturday and Sunday, Plaintiff worked and was able to complete the extra work that Jennifer Saunders had given to her and properly prepare for the first day of school and a faculty training.  Plaintiff alleges that she sent an email to Saunders reporting that she worked the entire weekend to complete her assignments.

47.     Plaintiff alleges that, on August 22, 2018, the first day of school for students, she was conducting a Semester Orientation in the Auditorium that was listed on her outlook calendar.  She alleges Saunders sent an email and carbon copied Human Resources, trying to make it look like Plaintiff was not reachable.  Plaintiff

alleges she became very ill after seeing the email.  Plaintiff told Saunders over the phone that her emails were causing her to be sick.

48.    Plaintiff alleges that, on August 23, 2018, she alerted Human Resources that Saunders had denied her request for vacation.

49.    Plaintiff alleges that, on August 23, 2018, Saunders called a secret meeting with her Administrative Assistant, Angie Wright, and the Nursing Secretary, Patrick Rameriz.  Plaintiff alleges that Saunders sent her an email to inform her that she would be completing "an assignment" for the Dean's office.  Plaintiff alleges that Angie Wright later told her that Saunders was trying to find a way to fire Plaintiff and that Saunders told Angie that, if she did not "cooperate", then Angie could lose her job.

50.    Plaintiff alleges that, on August 23, 2018, Jennifer Saunders demanded of Plaintiff to know if she had directed her Administrative Assistant to move back to her office.  Plaintiff alleges that she was aware that her Administrative Assistant was not happy about moving that day and told Saunders, but it was the only day that IT could set up the computer and the department needed to be ready for school to start the next week.

51.    Plaintiff alleges that, on August 24, 2018, Saunders was on vacation and did not leave notification notes of who was covering for her.  Plaintiff

15

alleges that she notified Saunders' secretary that she was ill and needed to take sick time, but was reprimanded later by Saunders for trying to take sick time because of her migraine headache.

52.     On August 24, 2018, Ms. Weiss left the office about an hour early due to a migraine. Saunders told Miss why she needed to take a full eight hours of sick leave, even though she only missed one hour of work. On September 5, 2018, Ms. Weiss stayed home from work due to a migraine.  Saunders required her to come in at 10:00 a.m. to finish a project. Saunders told Ms. Weiss that, if she continues to use sick leave or missed a meeting between migraine, she could be fired.

53.     Due to Saunders' hostility and reaction to miss weiss using sick leave, Ms. Weiss decided to apply for intermittent FMLA. Ms. Weiss believed this was necessary so that she could take time off when she had a migraine without harassment from Saunders. In the FMLA paperwork, Ms. Weiss's doctor reiterated that Ms. Weiss needed to be able to use a dark, quiet room to relieve her migraines.  Ms. Weiss received a letter from Jill Tewm Human Resources Coordinator, approving Mrs. Weiss' FMLA on September 10, 2018. On September 20, 2018, Mrs. Weiss took half a day of sick leave because she had a migraine. Saunders terminated Ms. Weiss the very next day.

54.     Plaintiff alleges that, on August 27, 2018, Plaintiff received an email reporting that Saunders had threatened her for not following the chain of command and felt she was being harassed.

55.     Plaintiff alleges that, on August 29, 2018, her Administrative Assistant (Angie) was visibly upset and unable to work.  Plaintiff alleges that Angie reported that it was because Saunders was trying to turn her against Plaintiff.

56.     Plaintiff alleges that, on August 29, 2018, Saunders gave Plaintiff a directive to present Schwoegler an Administrative Action Letter.  Plaintiff alleges she told Saunders, "I to not feel comfortable sharing this document with George.  I did not write it and I do not agree with some of the items".

57.     Plaintiff alleges that, on September 1, 2018, she received a letter from a student stating, "I am writing this letter to show my gratitude to the Nursing Department for the support I have received from Nursing Administration".

58.     Plaintiff alleges that, on September 4, 2018, Jennifer Saunders took away access for the department secretary (Patrick) to complete an audit.  Plaintiff alleges that she believes that Saunders did this to make it impossible for Plaintiff to complete her job.  Plaintiff alleges that she was very stressed about not being able to complete the audit and possibly losing clinical placement.  Plaintiff alleges that, due to this situation, she developed a severe migraine headache that night.

59.     Plaintiff alleges that, on September 4, 2018, she submitted a request for vacation.

60.     Plaintiff alleges that, on September 4, 2018, such vacation request was denied.

61.     Plaintiff alleges that, on September 4, 2018, she had a one-on-one meeting with Saunders, in which Plaintiff reviewed accomplishments made including successfully completing accreditation visit, providing leadership, supervision, and management of Nursing Division personnel, facilitating professional teamwork among nursing faculty members, updating the faculty handbook, and providing guidance to full-time and part-time nursing faculty regarding professional growth, evaluation, and tenure, and orienting new faculty that were new to the course or program.

62.     Saunders and Ms. Weiss had a one-on-one meeting on September 4, 2018 to discuss Ms. Weiss' professional objectives for the coming months. Saunders did not raise any of these concerns during this meeting.  Further, just prior to Ms. Weiss' termination, Karen Petroff ("Petroff"), Senior Vice President of Optum, wrote the College a letter specifically praising Ms. Weiss' leadership and the support she gave students.  One week before her termination, Ms. Weiss had been invited to participate as a Senior Advisor for the President and had attended the first meeting.

18

63.     Plaintiff alleges that, on September 5, 2018, Saunders again directed Plaintiff to send Administrative Notice to Schwoegler.  She alleges that she was not able to sleep that night and her migraine headache was worse.

64.     Plaintiff alleges that, on September 5, 2018, she was again sick with a migraine headache but was required to return for a meeting and to complete projects.  Plaintiff alleges that Saunders threatened her that, if she took sick time and missed a meeting, she could be fired.

65.     Plaintiff alleges that, on September 6, 2018, she received a letter from a Community Partner to President and Board of Regents, praising her work.

66.     Plaintiff alleges that, on September 6, 2018, she had a severe migraine headache and she was not able to drive.

67.     Plaintiff alleges that, on September 7, 2018, she missed an optional meeting because she was in Human Resources submitting an FMLA report. Plaintiff alleges that Saunders told her that she was "unprofessional not to communicate in advance".

68.     Plaintiff alleges that, on September 10, 2018, she requested intermittent FMLA leave for herself through June 30, 2019.  She alleges that she obtained Intermittent Family Medical Leave for severe headaches.

69.     Plaintiff alleges that, on September 17, 2018, President Huftalin introduced Plaintiff to the Senior Leadership team as a leader and commented on the great job that Plaintiff was doing in the nursing department.

70.     In _____, Wright was succeeded by Dr. Jennifer Saunders as Interim Dean.

71.     On September 21, 2018, Saunders, Interim Dean, School of Health Sciences, terminated Plaintiff's employment.

72.     Plaintiff alleges that, on September 21, 2018, Defendant terminated her from her position.

73.     Plaintiff alleges that, on September 21, 2018, she sent a letter to Robinson.

74.     Plaintiff alleges that, on September 24, 2018, she sent a letter to President Huftalin.

75.     Plaintiff alleges that, on September 29, 2018, she filed a report to the Nursing Accrediting body ("ACEN") for non-compliance with ACEN Standard 1 — Mission and Administrative Capacity, because the College had failed to appoint a qualified replacement for the Nursing Administrator and used Plaintiff's name on marketing materials.

76.     Plaintiff alleges that, on October 1, 2018, SLCC again used her name for marketing purposes.

77.     Plaintiff alleges that, on October 4, 2018, she received a letter from Human Resources offering her some severance pay in exchange for a release of claims.

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**
**DISCRIMINATION ON THE BASIS OF RELIGION**

78.     Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

79.     Plaintiff is a female with strongly held religious beliefs.

80.     Plaintiff alleges she was discriminated against by her direct supervisor because of her religion.

81.     In March 2018, during a one-on-one meeting, Plaintiff's supervisor attempted to persaude Plaintiff to investigate the Mormon church. Plaintiff's supervisor gave Plaintiff a gold chariot for Plaintiff's desk to "warn off evil ends evil spirits".

82.     Plaintiff alleges she complained to SLCC Human Resources, but Human Resources failed to do anything.

21

83.    Plaintiff was given a Notice of Concern from her supervisor in retaliation for reporting the discrimination that she has suffered for years under her supervisor's management.  Plaintiff was terminated as a result of that Notice of Concern.

84.    Plaintiff alleges that she experienced years of religious discrimination at SLCC and that the administration and employee relations did not believe her.  Plaintiff alleges that there was no real investigation done and she was not taken seriously.

85.    Plaintiff alleges that, after Provost Clifton Saudners asked her to accept the assignment of working in the Associate Dean of Nursing position, Wright was hired on as the Dean of Health Sciences and became Plaintiff' supervisor.  During this very first meeting with Wright, wright asked Plaintiff if she was "Mormon".  Plaintiff alleges she informed Wright that she was not.  Wright asked Plaintiff how she could grow up in Utah County and not know the Mormon faith.  Plaintiff alleges that she told Wright that she was very spiritual and happy with her religion.  Plaintiff alleges that, after that date, it was clear that Wright wanted to convert Plaintiff.  Whenever Wright had the chance, she would bring up religion and tell Plaintiff that she was praying for her to see the true gospel.  Plaintiff alleges that Wright told her to not tell anyone about their conversations on the subject of religion.

86.    Plaintiff alleges that, through the years, Wright's effort to convert Plaintiff to the Mormon faith increased.  Plaintiff alleges that, towards the end of March 2018, during a one-on-one meeting, Wright proceeded to share her religious point of view with Plaintiff and even gave her a gold chariot for her desk to "thwart off evil".  Plaintiff alleges she tried to change the subject, but Wright started to raise her voice and talked for over an hour about religion.  (The meeting had been scheduled for 30 minutes, but lasted for over an hour.)

87.    Plaintiff alleges that she was very upset after the meeting and immediately called John Robinson, the Human Resources representative.  Plaintiff alleges that she told Robinson what happened in the meeting and that she wanted Wright to stop proselyting her.  Plaintiff alleges that she could tell that Robinson did not believe her.  Plaintiff alleges that Robinson told her that Wright is a great person and he could not see her ever doing that to Plaintiff.  Plaintiff found out later from her supervisor, Wright, that Robinson had told Wright about Plaintiff's call.  Plaintiff alleges she never received a follow-up call from Robinson.  Plaintiff alleges that that is when the harassment was increased in earnest.

88.    Plaintiff alleges that, after she complained, Wright became very cold towards her and Plaintiff noticed changes in her second level supervisor, Provost Saunders.  Plaintiff alleges that she remembers walking out of her office and they were

both standing in the hall and they were talking about her.  Plaintiff alleges that they

immediately stopped talking about her and glared at her.  Plaintiff alleges she distinctly

remembers the look in Provost Saunders' eyes and that he was very upset with her.

Plaintiff alleges that she could not believe it because, just a few weeks before, he was

praising Plaintiff for her good work.  Plaintiff alleges that, after that day, and he never

spoke to Plaintiff again and he started to treat her differently.  Plaintiff alleges that

other colleagues that were allies of Wright also stopped talking to her, which made it

difficult for her to do her job because she needed to be able to work with other

departments to help the faculty prepare for accreditation.

   89. Plaintiff alleges that SLCC states that her allegation of

complaining to SLCC and that she did not report this discrimination to Margaret Vail

("Vail"), which they named as the Employee Relations representative is false.  Plaintiff

alleges that Vail was serving as the EEOC coordinator at the time of her employment

and was not moved to the Employee Relations position until after she left the College.

Plaintiff alleges that, during her employment at the College, Robinson was the contact

person for Employee Relations.

   90. Plaintiff alleges that her meetings with Bell were only in relation

to the hiring of new faculty members.  Plaintiff alleges that Vail did the mandatory

training for the hiring committees and that was the extent of her interaction with Vail.

Plaintiff alleges that she did not mention the discrimination to Vail because she was

not the proper contact person.  Plaintiff alleges that, in compliance with SLCC policy,

she reported the discrimination to Robinson because he was the one that was serving as

the Employee Relations representative at the time.

91.     Plaintiff alleges that, when nothing was being done by Human

Resources, she tried to make an appointment with Provost Clifton Saunders because he

was the next in the chain of command over her supervisor, but he refused to meet with

Plaintiff.

92.     Plaintiff alleges the following examples of some of the emails sent

to Plaintiff by Wright and actions taken by SLCC during her employment:

a.     September 26, 2014, Wright wrote, "Do not tip your hat[,]

as it were[,] and saying anything to anyone else";

b.     September 27, 2014, Wright stated in an email that she will

send prayers to Plaintiff;

c.     September 30, 2014, Wright told Petitioner to share as little

as possible with her Administrative Assistant, LeeAnn;

d.     October 5, 2014, Saturday, 4:13 p.m., Wright stated, "this

wasn't for John's eyes.  I am sorry… I probably feel most sorry that I sent that

other one with all the goofing is in it.  Again, that was under my direction and I

really do apologize";

    e.  October 7, 2014, Wright stated, "I am praying that both of

us will know what needs to be done and the timing of it";

    f.  October 12, 2014, Wright stated, "You know that you have

all my support and prayers";

    g.  December 2, 2014, Wright sent a Bible verse to my email:

"Matthew 12:34-35: O generations of vipers, how can ye, being evil, speak good

things?  For out of the abundance of the heart the mouth to speaketh.  A good

man out of the good treasurer or the heart bringeth forth good things: and an evil

man out of the evil treasurer bringeth forth evil things";

    h.  December 8, 2014, Wright stated, "I am so blessed to walk

this life path with you right now (well me in the whole other army noted in 2

Kings!!) Giggle";

    i.  January 31, 2016, Wright sent an e-mail referencing a Bible

verse: "Matthew 10:18!!!";

    j.  September 4, 2015, Wright wrote, "Scripture of the day:

Philippians 4:7 — and the peace of God, which passeth all understanding, shall

keep your hearts and minds through Christ Jesus.  ...There are depths in the seat

which the storms that lash the surface into fury never reached.  They who reached down into the depths of life where, in the stillness, the voice of God is heard, have the stabilizing power which carries them poised in surveying through the hurricane of difficulties (The Rewards, The Blessings, The Promises, And sign, January 1974)";

k.      May 15, 2015, Wright wrote, "For God hath not given us the spirit of fear, but of power and of love, and of a sound mind".  2 Timothy 1:17;

l.      The College did not believe Plaintiff when she reported the harassment and did not investigate.   Instead, the College praised Wright in faculty meetings, calling her a great leader and friend.   The College gave Wright personal gifts and threatened the faculty to not speak against her.   In one faculty meeting, with Professors Karen Risch ("Risch") and Shane Carter ("Carter") in attendance, the College said that they fully supported Wright and if any person goes against her, then they are going against the College;

m.      Plaintiff was denied a fair investigation and retaliated against.  Plaintiff's resource were taken, and, ultimately, she was terminated and deprived of any possibility of working for the College again;

27

n.      Plaintiff had reported the religious discrimination in March 2018.  Plaintiff was not alone on the day when she called Robinson.  Plaintiff alleges that those that were present when she reported the religious discrimination are reluctant for Plaintiff to provide their names for fear of retaliation by SLCC.   Plaintiff is providing their names here with the understanding that their names will not be shared with SLCC: Risch and Carter.  Risch and Carter also read Plaintiff's response to the Notice of Concern that she sent to Provost Saunders and carbon copied Human Resources and President Huftalin;

o.      The termination notice also stated, "while your contributions and skills that have brought value to the College in the past, there is a loss of confidence and trust in your abilities, and your continued employment at the College would be detrimental to the School of Health Sciences";

93.      Plaintiff alleges that she is confident that if she would not have endured the harassment and converted to her supervisor's religion, then her abilities as a leader would not have been questioned and there would have not been a loss and covenants from the administration.  Plaintiff alleges she would not have been terminated and would still be employed at SLCC.

94.     On September 21, 2018, Plaintiff was terminated.  The reasons were listed as unsuitability for the job requirements, unsatisfactory performance and unacceptable behavior that was identified as early as the spring of 2018.

95.     On May 30, 2018, a letter from her supervisor, Wright, two Provost Saunders reporting "wonderful news" and "The whole division, under Francene's guidance, has been working since the accreditation to put many of these things in place".

96.     On June 4, 2018, an e-mail from the Institutional Marketing and Communications Manager stating that Nursing came in first place and the most searched website and requested that Plaintiff share her marketing ideas with the group.

97.     On June 6, 2018, Plaintiff was elected as the Chair of the Associate Dean Council to represent the Associate Deans of the College.

98.     On July 2018, Plaintiff was promoted by Provost Saunders to be over the new SLCC Respiratory Department and was named Dean of Respiratory Services in addition to her current position as Dean of Nursing.

99.     On July 1, 2018, Plaintiff received a merit pay salary increase for positive work performance.

100.    On August 15, 2018, Plaintiff was invited by President of the College to serve on the Senior Leadership Team that was scheduled to start September 17, 2018.

101.    On September 1, 2018, Plaintiff received a letter from a student stating, "I am writing this letter to show my gratitude to the Nursing Department for the support I have received from the Nursing Administration".

102.    On September 4, 2018, Plaintiff received a satisfactory employee evaluation from her supervisor.

103.    On September 6, 2018, Plaintiff was informed by the President's office that one of the largest community partners that hires SLCC nursing graduates wrote a letter to the President and the Board of Regents praising the nursing program. The letter stated, "There are several individuals within your faculty that are seen by your students as contributors to their success.   In addition, the name venture graduates consistently highlight and speak so highly of his Francine Weiss.   Many have shared examples of the encouragement and guidance and support that she has provided and the differences she has made in their education and experience and ultimately professional success".

104.    On September 17, 2018, Plaintiff was introduced by the President to the Senior Leadership Team as a great leader and she prays Plaintiff for the good work that she was doing in the nursing department.

## SECOND CAUSE OF ACTION
## DISCRIMINATION ON THE BASIS OF DISABILITY

105.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

106.    Because of her disability, Plaintiff would, at times, request an accommodation in the form of being able to take time off.

107.    Plaintiff alleges that her supervisor, Wright, was aware that she experienced debilitating migraine headaches.  Plaintiff alleges she discussed this with Wright on several occasions and, once, she purchased a jumbo bottle of Excedrin and brought it to Plaintiff's office.  Plaintiff alleges she asked Wright for accommodations, and Wright allowed Plaintiff to go to a dark place if her headaches started and allowed her to use her vacation and sick leave, as needed, when the headaches were severe.

108.    Plaintiff alleges that, around the second week of August 2018, Saunders became Plaintiff's supervisor.  Plaintiff told Jennifer Saunders that she suffered from a disability of severe migraine headaches and asked her for accommodations.   Saunders told Plaintiff that migraines are not considered serious and would not allow her to leave the room when a migraine started.

31

109.   Plaintiff alleges that, on June 30, 2018, she was approved for medical leave due to serious medical condition.

110.   Plaintiff alleges SLCC usually denied her requests for time off, or if SLCC did grant her request, SLCC would "give her a hard time" about the hours/days she had taken off.

111.   Plaintiff alleges that, on August 15, 2018, she reported to her new supervisor that she was experiencing a severe migraine headache and needed to take a break and go to a dark place in the school.  Jennifer Saunders refused and called another meeting and made Plaintiff attend.  The migraine headache increased in intensity and she called in sick the next day.  When Plaintiff returned, Saunders gave Plaintiff extra job duties and threatened her with insubordination for not getting paperwork done when she was out of the office.

112.   Plaintiff alleges that, on August 17, 2018, in a meeting with Plaintiff and Plaintiff's supervisor, SLCC increased her workload, while at the same time, taking resources away from her.  This combination made it very difficult for Plaintiff to complete her work.

113.   Plaintiff alleges that, on August 22, 2018 she reported to Robinson in Human Resources that she was being denied her earned vacation, that she had a history of severe, debilitating migraine headaches and that she had been able to

successfully manage them for four years of employment because she had been granted accommodations.  Plaintiff complained to Robinson that, with her new supervisor, Robinson told Plaintiff that Saunders was not required to grant the accommodations without a doctor's note.

114.    Plaintiff alleges that, on September 10, 2018, she submitted paperwork from her doctor for Intermittent Family Medical Leave.

115.    Plaintiff alleges that, on September 21, 2018, Respondent terminated her employment.

116.    Plaintiff alleges that she was terminated only nine business days after the approval of her Intermittent Family Medical Leave.

## THIRD CAUSE OF ACTION
## RETALIATION

117.    Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

118.    Plaintiff alleges that the more she tried to stand up for herself, the more she was harassed and finally terminated.  It was not an easy thing for her to stand up because she had seen many others that were being harassed in the same way and once they spoke out, they were no longer employed at the College.  It was common knowledge that this was happening, and many feared losing their jobs and knew that

they would be unable to fight a state-funded school that has many lawyers and bottomless pockets of taxpayers' money.

119.   Plaintiff alleges that, less than two weeks after her supervisor learned that she had reported her to Human Resources for discrimination, a Notice of Concern was given to her by her supervisor.  The Notice was full of false statements and accusations.  Plaintiff reported to Human Resources that the Notice was not accurate and that she believed that it was given to her in retaliation of her report of discrimination.

120.   Robinson told Plaintiff that it would not be a part of her file and that there was nothing she could do about it.

121.   Before that time, she would regularly meet with Provost Saunders and had never been denied a meeting request.

122.   Plaintiff alleges she was denied the opportunity for an informal grievance.  She alleges that she was denied a meeting with Provost Saunders, which was the next in the chain of command.  Plaintiff alleges she believes that her denial of the meeting was in retaliation for her reporting against Wright.

123.   Plaintiff alleges that she wrote a response to the Notice of Concern and sent it to the Provost and carbon copy Robinson and President Huftalin. In the letter, plaintiff opened up about the harassment and discrimination that she was

experiencing and how she had been denied an appointment to meet with Provost Saunders.   Plaintiff alleges she received no response.   Later, the hard copy of the letter that was in a drawer in her office was missing.   Plaintiff alleges that she was told that administration had come through her office in the middle of the night.   Plaintiff alleges that she noticed that things had been moved around.

124.   Plaintiff alleges that, when Defendant terminated her employment, her personal computer that she used to write a response to the Notice of Concern that was in her office had disappeared.  Plaintiff alleges she reported this to Human Resources.  Plaintiff alleges that she had a special log and only her supervisor and security had access to her office.  The computer was never returned to Plaintiff, but some of her personal papers that were in the computer bag were returned months after she had been terminated.

125.   SLCC alleges that Plaintiff mismanaged the accreditation process. Plaintiff denies such allegation.  One of the reasons that, in May 2014, Plaintiff was asked to serve as the Dean of Nursing was because the program was out of compliance. The program was at risk for probation if the low pass rates would have continued.  In addition, the curriculum was out of date and did not meet the standards for accreditation which was outlined in the Notice of Concern that was issued to the Nursing Department before Plaintiff started work at SLCC.

126.    Plaintiff alleges she was able to work with faculty and, over the next two years, there was a dramatic increase in pass rates and dramatic decrease in attrition rates.

127.    Plaintiff worked with faculty to update the curriculum.   It took years to complete.  The Nursing Department not only met the Standard for Curriculum, but was commended on the excellence of the curriculum.

128.    SLCC alleges that Plaintiff missed deadlines.  Plaintiff denies such allegation.  She alleges not one deadline was missed in this submitting of the accreditation paperwork.  Risch and Carter served on the accreditation team and can attest to the fact that no deadlines were missed.

129.    SLCC alleges Plaintiff did not involve critical partners until the last minute is also false.  Preparation for the accreditation process started the moment that Plaintiff assumed the role in 2014.  Each faculty meeting was designed to improve the program and almost every meeting included critical partners, as evidenced in the monthly faculty minutes and the committee minutes from 2014 to 2018.

130.    Any program preparing for continuing accreditation must submit a self-study report to demonstrate the extent to which the program meets the accreditation standards and criteria.

131.    The process of self-study represents the combined efforts of the governing organization administrators, faculty, staff, students, and other individuals concerned with the nursing program.  All this associated with the program should participate in the self-study process.  This information can be found in the ACEN Accreditation Manual, pages 12 and 13, under the Self-Review and Self-Study Report heading, http://www.acenursing.net/manusals/General_Information.pdf.  The self-study report was submitted during the required time of six weeks prior to the date of the site visit.

132.    SLCC alleges that Provost Clifton Saunders, Wright, and Attorney Chris Lacombe had to work between Christmas and New Year's and long into the night to fix problems created by Plaintiff.   This is the first time that Plaintiff had heard this statement.  If this was the case, then it was not because of Plaintiff, but because of their own mismanagement because the Self-Study is a combined effort and not the responsibility of one person.

133.    The accreditation visit was a success.  There were areas that needed improvement, such as the lack of data collection during the year before Plaintiff started, but it was to be expected and the results in no way hurt the status of the program.

37

134.    Plaintiff alleges that, on May 30, 2018, Wright sent an email to the Provost Clifton Saunders and President Huftalin reporting that the nursing program successfully passed accreditation.

135.    SLCC alleges that Plaintiff's allegations of increased workload and decreased resources are false.  In July 2018, Plaintiff was given a tremendous increased workload.  She was assigned to not only be the Associate Dean of Nursing that had over 25 faculty and 500 students, but to also be the new Associate Dean of the Respiratory Program that had just been approved.  The Respiratory Program was not compliant with accreditation and needed development.  This was not a reasonable workload.  In addition, no extra compensation was given to Plaintiff, although it had been given to other Associate Deans that took on more than one department.   The termination letter addressed Plaintiff as "Francine Weiss, Associate Dean, Nursing and Respiratory Therapy".

136.    Adequate resources for not given.   There was not a stable director for the respiratory program because the school was in a legal dispute with the then current individual in the position of director, Schwoegler, regarding his claim of harassment in violation of his FMLA.  The school settled with Schwoegler and the Dean of Health and Sciences appointed a new faculty member to take his place.  This

38

individual had little academic experience and was not experienced in the set up of new programs.  Plaintiff asked for a consultant, but Defendant denied the request.

137.    Plaintiff alleges that there is a causal connection between the protected activity and SLCC's actions.

138.    Plaintiff alleges that the termination notice given to her on September 21, 2018 states that the decision was made from factors that were identified in the spring of 2018.  Plaintiff alleges she reported the harassment to Human Resources in March 2018.  Plaintiff alleges the termination is a direct result of the Notice of Concern that was given to her after her supervisor learned that Plaintiff had reported the supervisor to Human Resources.

139.    Several people had informed Ms. Weiss that she could return to a faculty position and her return to the faculty position was in the works when Miss Weiss was fired.  Ms. Weiss was initially told that she could return to the faculty position if she would accept the Interim Associate Dean Position. Provost Picard told her this when he asked her to consider accepting the Interim Associate Dean position. Ms. Weiss again discussed the possibility of returning to a faculty position with Wright when she consider taking the Associate Dean position, which Ms. Weiss was reluctant to take.  Wright told Ms. Weiss that she could return to faculty after the accreditation visit was completed.  Ms. Weiss also met with James Broadbent ("Broadbent"),

Director of Faculty Services, to discuss salary and benefits associated with going back to faculty status.  Broadbent told Ms. Weiss that she would receive any missed merit pay when she returned to faculty.  Additionally, in August 2018, Ms. White met with Jennifer Saunders, Interim Dean of the School of Health Sciences, asking to resign her position as the Chair of the nursing hiring committee so that she could apply for one of the four faculty positions that was available at the time, but the College was aware that Steven Weaver ("Weaver") would be resigning his position, so there would be another position available by the end of the year).  Ms. Weiss and Saunders discussed that Ms. Weiss would be perfect for the needed clinical position because she was a Licensed Nurse Practitioner and had experience as a nursing instructor.  Ms. Weiss requested that she be allowed to take the fourth faculty position in order to orient the new faculty and finish the accreditation duties.

140.    Ms. Weiss has a Rehabilitation Act claim against the College, in addition to a claim for breach of contract based on the College's violations of its own policies.  The College has committed to providing its employees leave in accordance with the FMLA, as stated in its Policies and Procedures Chapter 2, Policy 4.07.  During the summer of 2018, Saunders showed growing hostility towards Ms. Weiss for attempting to use her accrued vacation and sick leave.  Ms. Weiss began experiencing increasingly severe and frequent migraines during this time period.  Ms. Weiss

informed Saunders that she was experiencing migraines and needed a quiet, dark room to ease the symptoms when she had one.  On August 15, 2018, Saunders called Ms. Weiss into her office for a one-on-one meeting. Saunders proceeded to yell at and berate Ms. Weiss for over two hours.  At one point, Ms. Weiss informed Saunders that her behavior was giving her a migraine and she needed to leave.  Saunders told Ms. Weiss that she was not free to leave.  After this meeting, Ms. Weiss told Saunders that hostile one-on one meeting like that gave her migraines.  Saunders proceeded to schedule an additional one-on-one meeting that week.

141.    In the termination letter given to Ms. Weiss, Saunders claims that Ms. Weiss's employment was terminated due to her "unsuitability to job requirements, unsatisfactory performance, and unacceptable behavior".

142.    Ms. Weiss was terminated less than a month after requesting reasonable accommodations for her migraines and less than two weeks after being approved for intermittent FMLA leave.  Given the lack of documented performance issues, this temporal proximity, and Saunders' hostility towards Mr. Weiss's use of the sick leave, it appears Ms. Weiss was actually terminated in retaliation for requesting FMLA leave and reasonable accommodations.

### *SLCC's Reasons are Pretextual*

143.   Plaintiff incorporates by this reference all allegations listed in paragraphs 1 through ___ above as if alleged in full herein.

144.   SLCC states that the College terminated her employment for several reasons.  Each reason is false.

145.   Plaintiff alleges that, in July 2018, she was promoted by Provost Saunders to be over the new SLCC Respiratory Department and was named Gain of Respiratory Services, in addition to her current position of Dean of Nursing.

146.   Plaintiff alleges that, on July 1, 2018, she received a merit pay salary increase for her positive work performance.

147.   Plaintiff alleges that, on August 15, 2018, she was invited by President Huftalin to serve on the Senior Leadership Team that was scheduled to start September 17, 2018.

148.   Plaintiff alleges that, on September 1, 2018, she received a letter from a student stating, "I am writing this letter to show my gratitude to the Nursing Department for the support I have received from the Nursing Administration".

149.   Plaintiff alleges that, on September 4, 2018, she received a satisfactory employee evaluation from her supervisor.

150.   Plaintiff alleges that, on September 6, 2018, she was informed by President Huftalin's office that one of the largest community partners that hires SLCC

42

nursing graduates wrote a letter to the President and the Board of Regents praising the nursing program.  The letter stated, "There are several individuals within your faculty that are seen by your students as contributors to their success.  In addition, the named insured graduates consistently highlight and speak so highly of his Francine Weiss. Many have shared examples of the encouragement and guidance and support that she has provided and the difference that she has made in their education experience and ultimately professional success".

151.   Plaintiff alleges that, on September 17, 2018, she was introduced by President Huftalin to the senior Leadership Team as a great leader and she praised Plaintiff for the good work that she was doing and the Nursing Department.

(1)   **Managing the Accreditation Process:** within two weeks of learning that Plaintiff had reported her to Human Resources, the Letter of Concern was written by Plaintiff's supervisor.  The letter referred to concerns that happened at least four months before and were related to the consultant and not the accrediting body. The nursing program had been preparing for the site visit for four years. The ATI consultants worked with the department for about six weeks.

The concerns in the notice were surprising because Wright had never mentioned them before. Wright had participated in many faculty meetings

for accreditation and in a debriefing and had many opportunities to speak about her concerns, if she had any. She never did. Wright states that it is apparent that Plaintiff had mismanaged the tasks related to accreditation, but the truth is that Plaintiff managed to bring together a team of new faculty and to turn around a program that was in trouble. The Department successfully passed accreditation. If there was any mismanagement, then Wight should be partly responsible because accreditation is a team effort and not just the responsibility of one person.

Wright lists expectation items in the Notice of Concern. She states, "Work on regaining the trust of the faculty, administrators, College staff, and external partners that were impacted by the behaviors outlined in this notice". Plaintiff believes that Wright included this in the notice to show that Plaintiff was not trustworthy. Plaintiff had a great working relationship with colleagues within the College and external partners, which is evidenced by the letters of support that the College received naming Plaintiff specifically and invitations to serve on advisory committees. Plaintiff was also voted by her peers to represent them on the Associate Dean's Council.

44

On May 30, 2018, Wright sent an email to Provost Saunders and President Huftalin, stating, "Wonderful News – The whole division, under Francine's guidance, has been working ... to put many of these things in place".

(2)     **Failure to follow SLCC's hiring procedures:** SLCC states that Plaintiff did not provide priority screening criteria to Human Resources, as required by SLCC policy. This is not true.

Plaintiff had participated in the hiring of at least 30 new faculty over the course of four years.  She followed the same procedure each time for the hiring of faculty.  The hiring committee would meet with Vail and she would guide the team through the process of hiring.  The committee developed screening criteria that was approved by human resources.

On September 12, 2018, Plaintiff received notification to put a hold on the hiring process because Human Resources had not received the screening criteria from the committee.  Plaintiff was out sick but still responded to the email.  Plaintiff scheduled a meeting with Human Resources to resolve the problem.

(3)     **Weiss hired an employee that did not complete an application:**  It appears that, on October 25, 2017, Plaintiff received notification that an applicant had not completed an application.  Plaintiff does not completely

45

remember the incident, but she believes that it was an adjunct that had

accidentally filled out the full-time application.  Plaintiff had several

employment evaluations after October 25, 2017, where her supervisor could

have mentioned if it had been an area of concern.  Her supervisor never

mentioned it.

(4)     **Failure to follow procedures for faculty scheduling:** The

allegation is that Weiss did not submit "load sheets", which are used to set

faculty schedules and determine Department needs.  This is not true. Plaintiff

had submitted the faculty load sheets, but was missing one line on three faculty

worksheets. Both Plaintiff and her supervisor had missed the error and had

signed the form. On June 6, 2018, Plaintiff was notified by Human Resources

that the load sheets were missing the individual salaries. Plaintiff immediately

corrected the problem.

(5)     **Failure to comply with FMLA and follow instructions:**

The allegation is that while Angie Bright was on FMLA leave, Ms. Weiss

continually contacted Angie about work matters, that Angie asked Ms. Weiss to

stop contacting her and that Angie blocked Weiss' telephone number, but Ms.

Weiss continued to contact Angie and even went to Angie's home.  This is false.

Plaintiff and Angie had been friends for years before she recruited Angie to work as her Administrative Assistant.  Angie was on intermittent leave and would sometimes work only a few hours a day.  Plaintiff and Angie did things together outside of work.  Plaintiff's daughter, Kaylee Opfar, can speak to our friendship.  Angie was also a licensed beautician and she would color Plaintiff's hair.  Plaintiff was close to Angie's daughter and Angie's daughter asked Plaintiff to take her to get ice cream.  Angie was also close to Plaintiff's children and picked Plaintiff's daughter up from the airport.  Plaintiff and Angie talked almost every day and Angie would call Plaintiff when she was lonely or if she needed anything. If Angie had blocked Plaintiff, then she was not aware of it.  Angie was dating Plaintiff's cousin and he never mentioned anything about her not wanting to talk to Plaintiff and she never told Plaintiff not to call her.  Plaintiff alleges she would never call anyone on a block number.

(6)     **Making false statements:**  Saunders had just started in the Interim Dean of Health Sciences position when she came to Plaintiff's office and asked Plaintiff if she knew a John Fadden ("Fadden").  The College had close to 500 nursing students at the time, and Plaintiff did not remember that specific student. Saunders asked Plaintiff to find out the status of the student.

On August 22, 2018, Jennifer Saunders asked Plaintiff if she knew a student. Plaintiff said she did not, and Saunders asked her to investigate the student's status. Saunders told Plaintiff that it appeared that the Student was enrolled in nursing courses, even though he had not been admitted as a student. Plaintiff maintained she had no knowledge relating to this student.

When Plaintiff learned that Fadden was currently enrolled in a nursing course, she called him, and he reminded Plaintiff that he was a student that had met with the Dean of Health Sciences, Wright, and was sent to Plaintiff's office to register for the LPN to RN program. Plaintiff does not remember the situation completely, but it was routine at that time for the Department to help with registration of students. New students could not register themselves and Plaintiff's administrative assistant had registered hundreds of students each semester. Plaintiff is sure that Fadden will testify consistent with her recollection.

Plaintiff reported her findings to Saunders during a one-on-one meeting.

(7)    **SLCC later learned that Weiss had corresponded with the student as early as August 3, 2018, and Weiss knew the student and had introduced him that a woman whom he later married, as well as other staff**

**members.**  This is false.  Plaintiff had never met the student before the day that he he was sent to her office. Plaintiff never introduced him to any woman. Plaintiff may have introduced him to his teachers on the date he he registered. Plaintiff would often do that with new students, but otherwise, this statement is completely false.

(8)    **On September 4, 2018, after an investigation, Weiss was told to not speak to the student, but she contacted the student the next day.** Plaintiff was not aware of any investigation and she does not recall ever being told to not contact the student.  On September 4, 2018, Plaintiff met with Saunders for her yearly evaluation.  Saunders did not mention this incident and issued Plaintiff a satisfactory evaluation.

152.    Plaintiff alleges SLCC is looking for anything to defend its decision to unlawfully terminate her.  Plaintiff alleges she had weekly  one-on-one meetings with her supervisor, as well as an Employee Evaluation.  In her meetings, Saunders never mentioned any of these topics.  Plaintiff would think that, if she was doing something that was serious enough to warrant termination, then she would have been notified.  In addition, if she had been doing something serious enough to warrant termination, she would not have received a merit raise and then been invited by the President to participate as a Senior Leader.

49

## IV.  DAMAGES

153.   Ms. Weiss alleges Defendant's actions and inactions have caused her various losses, injuries and other damages, including lost wages, lost benefits, financial stress and emotional distress.

## V.  RELIEF REQUESTED

Declaring that Defendant discriminated against Ms. Weiss on the basis of her disability and retaliated against Ms. Weiss, in violation of the Title VII of the Civil Rights Act, and the ADA;

1.      Awarding Ms. Weiss "make whole" relief;

2.      Awarding Ms. Weiss her reasonable attorney's fees and costs;

3.      Declaring that Defendant violated HIPAA;

4.      Awarding Ms. Weiss such other relief as may be just and equitable.

DATED this ___ day of November, 2022.


   */s/ David J. Holdsworth*
David J. Holdsworth
*Attorney for Plaintiff*

**VERIFICATION**

Francine Weiss, being first duly sworn, upon her oath, deposes and says that she is the Plaintiff in the above-entitled action, that she helped prepare and has read the foregoing COMPLAINT and understands the contents thereof, and the statements made therein are true to the best of her knowledge and recollection.

_____
Francine Weiss

SUBSCRIBED AND SWORN to before me, a Notary Public, this _____ day of _____, 20____.

_____
NOTARY PUBLIC

MY COMMISSION EXPIRES:          RESIDING AT: _____

_____